**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| TPD Design House, LLC, | Case No. 26-11073 (DJB) |
| Debtor. | |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS REGARDING THE DEBTOR'S
MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF ASSETS
FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (II) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND AN UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASE, (III)
ALLOWING FOR THE SUBMISSION OF COMPETITIVE OFFERS AND
APPROVING A BREAKUP FEE, AND (IV) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

bankruptcy case of the above-captioned debtor and debtor in possession (the "Debtor"), by and

through its counsel, submits this limited objection and reservation of rights (the "Limited

Objection") to the *Debtor's Motion for Entry of an Order (I) Authorizing the Sale of Assets Free

and Clear of Liens, Claims and Encumbrances, (II) Authorizing the Assumption and Assignment

of Certain Executory Contracts and an Unexpired Non-Residential Real Property Lease, (III)

Allowing for the Submission of Competitive Offers and Approving a Breakup Fee, and (IV)

Granting Related Relief* [Docket No. 81] (the "Sale Motion").   In support of this Limited

Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT[1]**

1.      The Committee's principal concern is that the Debtor has not adequately marketed

its business before proposing a private sale of substantially all its assets, and certain features of the

---

[1] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to such terms as defined below.

185628422.5

proposed transaction—particularly the conveyance of avoidance actions and the inclusion of a post-sale employment arrangement with the Debtor's 100% equity holder and managing member, Vannessa Kreckel ("Ms. Kreckel"), as a condition precedent to the sale—risk harming the estate and diminishing recoveries available to unsecured creditors. Furthermore, it has recently come to the Committee's attention that there are at least two other parties who are seriously interested in acquiring the Debtor's assets but require additional time to engage in due diligence. Without additional time for other bidders to meaningfully participate in the sale process and without further safeguards in place, the Sale Motion should not be approved on the current record.

2. While the Committee does not necessarily object to a value-maximizing sale process in principle, given the prepetition conduct of Ms. Kreckel and the circumstances that precipitated the Debtor's bankruptcy filing, the Committee believes the proposed sale must be subjected to heightened scrutiny. In the years leading up to this case, the Debtor managed to raise tens of millions of dollars of investments from creditors who were eager to see the Debtor's business succeed. However, the Debtor's recent financial disclosures show that while the Debtor was experiencing financial distress, Ms. Kreckel was flagrantly violating her fiduciary duties by routinely extracting proceeds from the company to pay down her personal expenses. In light of this historical context, the Committee believes that blind deference to the Debtor's business judgment is not appropriate, and that significant disclosure and diligence is required before approving any sale transaction, especially one that stands to solely benefit the Debtor's DIP lender and primary prepetition secured lender, Beacon Bank and Trust ("Beacon").

3. Under the circumstances of this case, the Debtor has not demonstrated that this sale process is reasonably designed to maximize value for all creditors. The Sale Motion expressly states that the Debtor is not proposing formal bidding procedures. The Debtor seeks to rely on an

abbreviated opportunity for competing bids, requiring any overbid to exceed Oslo Blue's consideration by at least $50,000.00, while the consideration may include a waiver of Oslo Blue's own postpetition loan claim. That structure materially chills bidding and makes it difficult for third parties to determine what they must actually bid to compete with a lender-purchaser. Given that the Committee is aware of at least two prospective purchasers at this time that require additional time to evaluate the Debtor's business, the Committee believes that a more robust and extended sale process is appropriate.

4.    Moreover, the following facts cast doubt on the notion that the proposed sale constitutes an arm's length transaction: Oslo Blue is the Debtor's DIP lender; Oslo Blue's sole member, Scott Tarte, is a current client of the Debtor; Mr. Tarte's daughter is an employee of the Debtor; Mr. Tarte's son assisted in preparing cash-flow projections used to determine the Debtor's borrowing needs; and Oslo Blue is requiring, as a precondition of the sale, an employment agreement with Ms. Kreckel, the Debtor's principal. Even if Oslo Blue contends it is not a statutory insider, these connections create at least an insider-like transaction that cannot be approved based on conclusory assurances of arm's-length negotiations and good faith.

5.    Particularly troubling, the proposed sale includes the transfer of certain avoidance actions without ascribing any value to the claims being transferred. The avoidance actions belong to the estate, and, absent a demonstrated value-maximizing reason, should be preserved for the benefit of unsecured creditors. In addition to approximately $1.3 million in potentially avoidable transfers to non-insiders (approximately $1 million of which Oslo Blue has expressly sought to purchase), the Debtor's Schedules and Statements identify substantial insider-related transfers involving Ms. Kreckel in the approximate amount of $1.5 million, which were used primarily to pay Ms. Kreckel's personal expenses.

3

6.      For these reasons, the Committee respectfully requests that the Court deny the Sale Motion as filed and provide for an extended bid deadline.  At a minimum, any Order should require a meaningful marketing process and adequate bid procedures; exclude all Chapter 5 and other estate causes of action from the Purchased Assets unless the Debtor clearly identifies, values, and separately allocates consideration to each such claim; preserve any value attributable to unencumbered avoidance actions for unsecured creditors; and require additional notice and disclosure of the proposed employment arrangement with Ms. Kreckel before the sale hearing.

**BACKGROUND**

A.      **General Background and Bankruptcy Procedural History**

7.      The Debtor is a creative agency that provides services including brand identities, website design and development, event design and production, experiential activations, bespoke stationery and packaging, gifting experiences and installations, environmental and stage design, digital assets, and related services.  The Debtor's own filings indicate that its business has existed (including its predecessor) for approximately 26 years, and the Debtor serves a broad base of corporate and individual customers both domestically and internationally.

8.      On March 16, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-captioned case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Court").  The Debtor continues to operate its business and manage its property as debtor-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.      Additional information regarding the Debtor's history, business operations, capital structure, and the events leading up to the commencement of this Chapter 11 Case can be found in

the *Declaration of Vanessa Kreckel in Support of First Day Motions* [filed with Docket Nos. 14-18] (the "First-Day Declaration").

10.     Among other first-day motions, on March 18, 2026, the Debtor filed the *Debtor's Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Further Hearing, and (IV) Granting Related Relief* [Docket No. 17] (the "Cash Collateral Motion").  Included with the Cash Collateral Motion was a budget, which projected the Debtor's anticipated income and interim cash collateral needs for the first seven weeks of the Chapter 11 Case.  On March 18, 2026, the Debtor filed an amended budget [Docket No. 24] (the "First Amended Budget").  The First Amended Budget projected that the Debtor would receive approximately $1,041,000.00 during the first seven weeks of the Chapter 11 Case.  Moreover, as disclosed in the Cash Collateral Motion, Beacon holds a secured claim against the estate on account of an outstanding term loan with a current balance of in excess of $3,000,000.00, along with a fully extended line of credit in the amount of $1,000,000.00 (the "Prepetition Loans").  The Debtor represented that Beacon holds a first and second priority lien in and against all of the Debtor's personal property.

11.     On March 20, 2026, the Court entered an Order granting the relief sought in the Cash Collateral Motion on an interim basis [Docket No. 37] (the "First Interim Cash Collateral Order"), and on May 6, 2026, the Court entered a second Order further granting the relief sought on an extended interim basis [Docket No. 99] (the "Second Interim Cash Collateral Order, together with the First Interim Cash Collateral Order, the "Cash Collateral Orders").

12.     On April 7, 2026, the Office of the United States Trustee for the Eastern District of Pennsylvania (the "U.S. Trustee") appointed three (3) members to the Committee: (i) Peter D'Sa; (ii) Shon Michael; and (iii) Amit Patel [Docket No. 56].  The Committee selected Fox Rothschild

5

LLP ("Fox Rothschild") as its counsel on April 8, 2026, and the Court entered an Order approving the Committee's retention of Fox Rothschild on May 8, 2026 [Docket No. 107].

13.    On April 13, 2026, the Debtor filed the *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to: (I) Obtain Post-petition Financing Pursuant to Sections 364 and 363 of the Bankruptcy Code, (II) Granting the Lender a Claim with Priority Status Over any and all Administrative Expenses Pursuant to Section 364(c)(1) of the Bankruptcy Code, (III) Modifying the Automatic Stay to Implement the Financing Terms; and (IV) for Expedited Consideration Thereof Pursuant to Local Bankruptcy Rule 5070-1(g)* [Docket No. 60] (the "First DIP Motion"), seeking approval to borrow up to $1,000,000.00 from Oslo Blue to fund working capital needs (the "DIP Facility").  In the First DIP Motion, the Debtor stated that, despite initial projections in the First Amended Budget, the Debtor's post-petition collections were slower than anticipated and the Debtor projected having an approximate $730,000.00 cash shortfall through June 6, 2026.  *See* First DIP Motion at ¶¶ 12, 14.  Attached to the First DIP Motion as Exhibit A was an updated 9-week budget (the "Second Amended Budget"), covering the period from April 5, 2026 through June 6, 2026.

14.    Moreover, in the First DIP Motion, the Debtor disclosed that Oslo Blue is a single-member limited liability company owned by Scott Tarte.  *See id.* at ¶ 3.  The Debtor further disclosed that Mr. Tarte is a current client of the Debtor, that Mr. Tarte's daughter is an employee of the Debtor, and that Mr. Tarte is interested in purchasing substantially all of the Debtor's assets. *See id.* at ¶ 22.  While not initially disclosed in the First DIP Motion, the Sale Motion later provides that Mr. Tarte's son, Evan Tarte, assisted in creating cash-flow projections used to determine the Debtor's cash needs and the amount to be funded through the DIP Facility.  *See* Sale Motion at ¶ 40.

15.      On April 20, 2026, the Court entered an Order granting the relief sought in the First

DIP Motion on an interim basis [Docket No. 74] (the "First Interim DIP Order"), and on May 6,

2026, the Court entered a second Order further granting the relief sought on an additional interim

basis [Docket No. 100] (the "Second Interim DIP Order", together with the First Interim DIP Order

and any subsequent interim DIP Orders, the "Interim DIP Orders").

16.      Pursuant to the Interim DIP Orders, Oslo Blue has been given a superpriority

administrative expense claim under Section 364(c)(1), subject only to the Carve-Out (as defined

in the Second Interim DIP Order), with priority over all other administrative expenses under

Sections 503(b) and 507(b).  *See* Second Interim DIP Order at ¶¶ 3(c) and 3(g).  The Interim DIP

Orders also provide Oslo Blue with "unfettered discretion" to advance loans under the DIP Facility.

*Id.* at ¶ 3(e).  Furthermore, the Second Interim DIP Order expressly states that Oslo Blue "reserves

the right to include the unpaid portion of its Interim Loan as partial consideration towards an

anticipated offer by the Lender (or an affiliated entity) to purchase substantially all of the Debtor's

assets."  *Id.* at ¶ 3(d).

17.      After two extensions, on April 26, 2026, the Debtor filed its Schedules of Assets

and Liabilities (the "Schedules") and Statement of Financial Affairs [Docket No. 80] (the "SOFA",

collectively with the Schedules and any other supplemental financial disclosures by the Debtor,

the "Schedules and Statements").  Attached to the SOFA was a schedule evidencing $1,301,403.86

in prepetition transfers made by the Debtor in the ninety (90) days leading up to the Petition Date

(the "Preference Period").  The SOFA indicated that a schedule showing prepetition transfers to or

for the benefit of insiders was "to be filed supplementally."  SOFA at § 4.1.

18.      On April 27, 2026, the Debtor filed the Sale Motion [Docket No. 81], seeking

authority to sell substantially all of its assets to Oslo Blue (the "Sale"), pursuant to that certain

Asset Purchase Agreement (the "APA") attached as Exhibit A to the Sale Motion.  On May 1, 2026,

the Debtor filed the related *Notice of Proposed Private Sale of Assets Free and Clear of Liens,*

*Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363 and Bankruptcy Rule 2002*

[Docket No. 92] (the "Sale Notice").

19.    On May 8, 2026, the Debtor filed a supplemental disclosure to its SOFA [Docket

No. 106] (the "Supplemental Disclosure"), identifying $1,471,039.02 in prepetition transfers (the

"Insider Transfers") paid by the Debtor directly to or for the benefit of Ms. Kreckel in the year

prior to the Petition Date.  The Supplemental Disclosure represented that Ms. Kreckel paid

$1,375,704.43 in "offsetting" transfers back to the Debtor.

20.    On May 14, 2026, the U.S. Trustee conducted the Section 341(a) Meeting of

Creditors (the "341 Meeting").  At the 341 Meeting, counsel for the Committee appeared and asked

Ms. Kreckel several questions regarding the Insider Transfers.  Based on the Supplemental

Disclosure and representations made under oath by Ms. Kreckel, the Committee has reason to

believe that a substantial amount (if not all) of the Insider Transfers were used to pay personal

expenses of Ms. Kreckel, including but not limited to, payments with respect to her mortgage, car

loans, insurance, personal medical expenses, schooling for her children, veterinary services and

purchases for her pets, nail and hair appointments, yoga classes, home furnishing, clothing, and

other frivolous charges related to games and entertainment for her and her family.

21.    In the evening after the 341 Meeting, the Debtor filed the *Debtor's Motion (I)*

*Pursuant to Bankruptcy Rule 9024 to Amend Interim Order Authorizing the Debtor to Obtain Post-*

*Petition Financing Pursuant to Sections 364 and 363 of the Bankruptcy Code; and (II) for*

*Expedited Consideration Thereof Pursuant to Local Bankruptcy Rule 5070-1(g)* [Docket No. 112]

(the "Second DIP Motion", together with the First DIP Motion, the "DIP Motions").  Through the

Second DIP Motion, the Debtor sought an Order on an expedited basis to increase borrowings under the DIP Facility from $926,256.00 to $1,352,362.00 through June 6, 2026. *See* Second DIP Motion at ¶ 12. Attached to the proposed order included with the Second DIP Motion was a further revised budget (the "Third Amended Budget") through the same date.

22. In the Second DIP Motion, the Debtor represented that there was a need for additional funding due to cash receipts being approximately $137,000.00 lower than anticipated, as well as an anticipated increase in expenses by approximately $150,000.00 through June 6, 2026. *Id.* Moreover, the Debtor averred that "[a]ll other terms of the DIP Financing Order will remain in place and are unaltered except to the extent of the amount of the loan as set forth in this Motion." *Id.* at ¶ 15.

23. On May 19, 2026, the Court entered an Order granting the relief sought in the Second DIP Motion (the "Third Interim DIP Order") on an additional interim basis. While not explicitly addressed in the Third Interim DIP Order, on the record at the hearing prior to entry of the Third Interim DIP Order, Oslo Blue stated that, to the extent it is the prevailing purchaser for the Debtor's assets, it will waive its superpriority administrative claim in its entirety.

24. On May 22, 2026, the Debtor filed a copy of the fully executed APA, which includes Schedules showing (i) which contracts and leases Oslo Blue is proposing to assume and (ii) avoidance actions against several transferees to be included in the Sale (the "Avoidance Actions"). The Debtor's Schedules and Statements show prepetition transfers in the aggregate amount of $954,535.82 (the "90-Day Transfers") during the Preference Period to the counterparties of the Avoidance Actions.

25. A final hearing with respect to the Sale Motion and the DIP Motions is currently scheduled for May 28, 2026 at 1:30 p.m.

9

### B.      Overview of Proposed Sale and Sale Process

26.      The proposed purchase price (the "Purchase Price") for the Sale consists of $700,000.00 in cash, plus an additional $100,000.00 if the Sale does not close by June 15, 2026, and up to an additional $315,000.00 tied to the Debtor's collection of accounts receivables that existed as of the Petition Date. *Id.* at ¶ 17(b).

27.      The Sale contemplates conveying the following assets of the Debtor to Oslo Blue (collectively, the "Purchased Assets"): (i) all tangible personal property, (ii) all intellectual property, (iii) certain assigned contracts and leases, (iv) governmental authorizations, (v) customer deposits, (vi) the Avoidance Actions, (vii) diligence-related confidentiality rights, and (viii) all books and records. *See* Sale Motion at ¶ 17(a).

28.      With respect to the Avoidance Actions, neither the Sale Motion, APA, nor the Sale Notice ascribes any clear value or allocates any portion of the Purchase Price to the Avoidance Actions being transferred in connection with the Sale. Instead, the APA indicates that Oslo Blue will prepare and deliver to the Debtor, within forty-five (45) business days after closing, a schedule allocating the Purchase Price among the applicable assets. *See* APA at § 1.5(c). The APA further provides that the allocation among the Purchased Assets shall be "in accordance with their relative fair market value as determined by the Purchaser in its sole discretion." *Id.* The Committee finds this particularly concerning given that, as discussed above, the Debtor's Schedules and Statements show up to about $1 million in 90-Day Transfers to the counterparties of the Avoidance Actions. The avoidance of some or all of the 90-Day Transfers could otherwise result in material recoveries for unsecured creditors.

29.      Moreover, the Committee notes that the conveyance language in the APA may capture additional claims beyond those specifically outlined therein, including claims connected

to the alarming $1.5 million in seemingly fraudulent Insider Transfers to or for the benefit of Ms. Kreckel. While the Sale Motion itself suggests that the Avoidance Actions are limited to those against "identified vendors or counterparties to assigned leases or contracts," the APA and the Sale Notice refer more broadly to "*[a]ll* avoidance actions under Chapter 5 of the Bankruptcy Code related to the Purchased Assets, Assumed Liabilities, and/or the Business, including without limitation all such actions that may exist against those of the Debtor's vendors with whom the Purchaser continues to do business …." *See* APA at § 1.1(f) (emphasis added); Sale Notice at ¶ 5(f). The Committee believes this ambiguity makes it unclear whether avoidance claims beyond those specified in the schedules attached to the APA may nevertheless be deemed transferred to Oslo Blue upon approval of the Sale.

30. Oslo Blue is also requiring "a mutually agreeable employment agreement with Ms. Kreckel as a condition precedent to the effectiveness of the APA." Sale Motion at ¶ 17(d). In the Sale Motion, the Debtor represented that no employment arrangement had yet been agreed to and that, if an agreement were reached, the agreement or its terms would be disclosed to the Court and parties entitled to notice. *Id.*

31. Not until Friday evening on May 22, 2026—the beginning of the holiday weekend—did the Debtor provide the Committee's counsel with a copy of the already-executed employment agreement between Oslo Blue and Ms. Kreckel, dated May 11, 2026 (the "Employment Agreement"). Pursuant to the Employment Agreement, Ms. Kreckel is to be employed as the Chief Creative Officer, and will receive a base annual salary of $300,000.00. Ms. Kreckel's eligibility for bonuses in her first year of employment is at management's sole discretion. Additionally, the Employment Agreement is terminable at-will, and if Ms. Kreckel leaves for

"Good Reason" or is terminated "Without Cause," she would be entitled to lump sum payment equal to $100,000.00.

32.     Despite the Debtor's representation that the terms of the Employment Agreement would be disclosed to the Court and parties entitled to notice, the Debtor has not filed anything with the Court to evidence the existence of the Employment Agreement, nor is the Committee aware of any other parties that have received a copy of the Employment Agreement.

33.     By the Sale Motion's own concession, the Debtor is not proposing formal bidding procedures.  *See* Sale Motion at ¶ 35.  The Debtor contends formal bidding procedures are unnecessary or inappropriate "due to the exigencies of the sale process as well as the belief that the third party interest will be minimal …."  *Id.* at ¶ 64.

34.     Nevertheless, the Debtor promised to notify all parties of interest and any parties the Debtor suspects may have an interest in acquiring the Purchased Assets and assures that the Sale "is subject to alternative competing bids, thereby creating a mechanism to solicit higher and better offers for the Purchased Assets."  *Id.* at ¶¶ 35, 65.  Under this proposed mechanism, a competing bid must submit a bid in a form substantially similar to the APA and must provide cash consideration at least $50,000.00 greater than Oslo Blue's consideration.  The Sale Motion specifically notes that because Oslo Blue's consideration "may include a waiver of any unpaid portion of the Purchaser's post-petition loan to the Debtor, any party interested in purchasing the Purchased Assets should contact Debtor's counsel to confirm the total consideration being offered by Oslo Blue for purposes of calculating the overbid amount."  *Id.* at ¶ 66.

35.     Since the filing of the Sale Motion, the Committee has become aware of at least two additional parties who are interested in purchasing the Debtor's business.  Upon information and belief, these parties are still in the process of obtaining information from the Debtor that is

necessary to properly perform diligence with respect to the Debtor's assets and overall business. Moreover, given the holiday weekend, they face significant disadvantages in submitting competitive bids prior to the hearing on May 28, 2026.

36.    Given that critical details of the Sale remain undisclosed to all parties in interest and that there are other potential purchasers who wish to participate in the sale process, the Committee believes that the current sale timeline must be extended.  Accordingly, in order to protect the best interests of the estate and the unsecured creditors, the Committee files this Limited Objection to the Sale.

### OBJECTIONS

**A.    The Debtor Has Not Carried Its Burden to Show that the Sale Process Maximizes Value and that the Sale Is in the Best Interests of the Estate.**

37.    Section 363(b) permits a debtor to sell estate assets outside the ordinary course of business only after notice and a hearing and upon a showing of a sound business purpose.  *See* 11 U.S.C. § 363(b).  *See In re Encore Healthcare Associates*, 312 B.R. 52, 55 (Bankr. E.D. Pa. 2004) ("[T]here must be some business justification, other than appeasement of major creditors before the bankruptcy judge may order such disposition under § 363(b) . . . The debtor applying under § 363(b) must demonstrate that a sale will aid the debtor's reorganization.").  The Debtor itself identifies the governing inquiry as whether a sound business reason exists, fair and reasonable consideration is provided, the transaction was proposed and negotiated in good faith, and adequate and reasonable notice was provided.  Sale Motion at ¶ 26 (citing *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  Those requirements are not satisfied on this record.

38.    As stated above, the Debtor is seeking approval of a private Sale of substantially all the Debtor's assets without formal bid procedures.  The Debtor justifies this approach by

13

asserting exigency and speculating that third-party interest will be minimal because the Debtor is a service business whose clients generally engage it on a project-by-project basis. That explanation is not sufficient under the circumstances.

39.    The Debtor has a long operating history, a broad base of customers, and a business that serves both domestic and international clients. Those facts cut against the Debtor's assumption that third-party interest would be minimal and support a meaningful marketing process rather than a private, lender-driven sale. Indeed, the Debtor's Schedules and Statements show significant revenues of nearly $12 million in each of the 2024 and 2025 calendar years, suggesting that the Debtor could have a positive cash-flow and significant going-concern value if sold through a free and clear bankruptcy sale. *See* SOFA at § 1. Moreover, the fact that the Committee is aware of at least two other purchasers interested in acquiring the Debtor's business further rebuts any suggestion that there is limited third-party interest. The Committee submits that there is ample reason to believe that the Debtor's business is desirable and could garner a much higher purchase price if subjected to a more robust sale process.

40.    Nevertheless, the current sale process is not conducive to competitive bidding. The Sale Motion and Sale Notice require competitive bids to provide cash consideration at least $50,000 greater than the consideration set forth in the APA. But because Oslo Blue's consideration may include a waiver of its administrative claim, the actual baseline against which third parties must bid is uncertain. This uncertainty undermines the Debtor's ability to prove that the APA represents the highest and best offer for the Purchased Assets.

41.    Additionally, the current sale timeline does not permit third-parties sufficient time to evaluate the Debtor's assets and formulate a competitive bid. Presently, there are at least two parties who are trying to obtain necessary diligence information from the Debtor. Given the

14

holiday weekend and the fast-approaching Sale hearing, these parties are at a significant disadvantage to Oslo Blue. In general, the Debtor's sale process (to the extent it can be said there is a process) cannot be considered a transparent or market-tested process; it is a mechanism that will likely chill bidding by denying other interested parties a reasonable opportunity to evaluate the Debtor's business and allowing the Debtor and Oslo Blue to set a moving target for potential overbidders.

42. The Debtor's proposed order seeks broad findings that the APA is the highest and best offer, that appropriate marketing efforts were conducted, that the purchaser is a good-faith purchaser, that the transaction was negotiated at arm's length, and that the purchaser is not an insider. Those findings are not supported by the process described in the Sale Motion. The Sale Motion says there are no formal bidding procedures and provides no evidence of an investment banker, broker, data-room process, broad solicitation, market canvas, list of contacted parties, or meaningful prepetition marketing process. The Court should not approve findings of extensive marketing, fair value, and good faith solely based on conclusory statements and an under-developed evidentiary record.

43. The need for scrutiny is heightened because this transaction bears multiple insider-like attributes. "An insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the 'entire fairness' of the transaction at issue." *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (holding that a postpetition financing transaction between a debtor and an insider was subject to heightened scrutiny); *In re Winstar Cmmcn's Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.") (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)).

Where a potential purchaser is not disinterested or independent, the Debtor may not rely on the business judgment rule, and instead, the Court must review the Debtor's decision by "applying the entire fairness standard.  This requires proof of fair dealing and fair price and terms." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re Biddermann Industries U.S.A., Inc.*, 203 B.R. 547, 551-52 (subjecting a proposed sale to insiders where "the debtors have not hired an investment banker to test the marketplace for other expressions of interest" to heightened scrutiny).

44.     Oslo Blue's sole member is a current client of the Debtor, his daughter is an employee of the Debtor, his son assisted with cash-flow projections used to determine the Debtor's borrowing needs, Oslo Blue is the DIP lender, and, as a condition precedent to closing, Oslo Blue and Ms. Kreckel entered into the Employment Agreement.  These facts, when partnered with Ms. Kreckel's misappropriation of company proceeds, suggests that blind deference to the Debtor's business judgment may not be appropriate.  Even if Oslo Blue disputes insider status, these relationships still warrant careful review of the sale economics, the sale process, and whether any consideration is flowing to insiders or to the lender-purchaser at the expense of unsecured creditors.

45.     The Sale Motion should therefore be denied unless and until the Debtor can demonstrate that the assets have been adequately marketed, that other third-party potential bidders have had a fair opportunity to conduct diligence and submit competing offers, and that the proposed sale is the product of a value-maximizing process rather than a transaction structured for the exclusive benefit of the DIP lender and Beacon.  At a minimum, the Court should require formal bid procedures, clear disclosure of the purchase-price baseline, adequate time for diligence, a transparent overbid process, and evidence of broad solicitation before approving any sale.

**B.**    **The Debtor Must Value Any Avoidance Actions Being Sold and Preserve Any Allocated Value for the Benefit of Unsecured Creditors.**

46.    Pursuant to the Sale Motion and the APA, the Purchased Assets include Avoidance Actions against identified vendors or counterparties to assigned leases or contracts with whom Oslo Blue continues to do business.  These Avoidance Actions are unencumbered assets that must be preserved for the benefit of unsecured creditors.  Given the amount of the Debtor's secured debt, these claims are likely to be the only (if any) source of recovery for unsecured creditors.  The Debtor should not be permitted to simply bundle these claims into a going-concern sale without identifying what these claims may be worth.

47.    Indisputably, avoidance actions are an important tool for providing recovery to unsecured creditors.  *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd., Partnership IV (In re GenFarm Ltd., P'ship IV)*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors . . . ."); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904–05 (D.N.J. 1987) (observing that avoidance actions should be pursued for the benefit of all unsecured creditors); *In re Roblin Industries*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (denying debtor-in-possession financing where debtors were required to waive avoidance actions as a condition of the loan); *see also Official Comm. of Unsecured Creditors v. Gold Electronics Corp. (In re Gold Electronics Corp.)*, 1993 WL 408366, at *3–4 (N.D. Ill. Sept. 22, 1993) (vacating lien on preference actions).

48.    The intent behind avoidance powers and a debtor's power to bring causes of action is to allow the debtor in possession to gain recoveries for the benefit of, and provide for the equitable treatment of, all unsecured creditors. *Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243-47 (3d Cir. 2000)

17

(explaining that avoidance powers are statutorily created powers which may be used by a Chapter 11 debtor-in-possession to recover property on behalf of the bankruptcy estate, but which do not belong to the debtor); *Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 671 (Bankr. D. Del. 2018) (*quoting AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.*), 335 B.R. 309, 326 (Bankr. D. Del. 2005)) ("Fraudulent transfer actions, whether brought under § 544(b) or § 548, do not belong to a debtor; '[t]hey are creatures of statute, available in bankruptcy solely for the benefit of creditors of the debtor, whose rights the trustee enforces.'").  Some courts have determined that the Bankruptcy Code precludes Chapter 11 debtors from selling avoidance actions.  *See In re Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.)*, 58 B.R. 357, 358 (Bankr. S.D. Tex. 1986) ("[B]oth pre-Code and post-Code, neither a trustee in bankruptcy, nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference"); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (same).

49.     The APA does not allocate a portion of the Purchase Price to the Avoidance Actions, nor does it attempt to estimate any potential recoveries.  Instead, the APA gives Oslo Blue sole discretion—after the Sale closes—to allocate the Purchase Price amongst the Purchased Assets. As it stands, creditors and the Court will not be able evaluate whether the Debtor is selling valuable unencumbered estate claims for no incremental consideration until after the fact.

50.     There is approximately $1 million in 90-Day Transfers paid by the Debtor to the vendors and counterparties identified in the APA with whom Oslo Blue expects to continue doing business.  Oslo Blue is likely acquiring estate claims not to prosecute them for creditor recoveries, but to neutralize claims against the very parties necessary to its post-Sale business.

18

51.    The prospect of acquiring the Avoidance Actions for the purpose of neutralizing claims against business partners becomes even more alarming, when, as noted above, there appears to be up to $1.5 million in potentially fraudulent Insider Transfers involving Ms. Kreckel.  Given the broad and ambiguous conveyance language in the APA, providing for the sale of "*[a]ll* avoidance actions under Chapter 5 of the Bankruptcy Code related to the Purchased Assets, Assumed Liabilities, and/or the Business, *"* it is not clear whether claims against Ms. Kreckel are also being transferred through the Sale.  The potential purchase of claims against Ms. Kreckel, when viewed alongside the fact that Oslo Blue is entering into a post-Sale employment arrangement with Ms. Kreckel, raises the specter that Oslo Blue is providing Ms. Kreckel with additional post-closing compensation that could have the effect of influencing the sale process, reducing the Purchase Price, or creating perverse incentives for Debtor to favor Oslo Blue over other potential bidders.  Any order approving the Sale should expressly state that claims related to the Insider Transfers are not being transferred through the Sale.

52.    Accordingly, the Committee respectfully submits that the Avoidance Actions should be excluded from the Purchased Assets.  Alternatively, if the Court permits any sale of some or all of the Avoidance Actions, the applicable sale order should require the Debtor to identify each claim being sold, the proposed defendant, the factual basis, the estimated value, any defenses, and the amount of purchase price allocated to each claim.  Any value allocated to avoidance actions should be segregated and held in escrow for the benefit of unsecured creditors.

**C.    <u>Greater Notice of, and Time to Scrutinize, the Details of the Employment Agreement Is Required Before the Sale Is Approved.</u>**

53.    Lastly, the Sale Motion and the effectiveness of the APA are expressly conditioned on Oslo Blue and Ms. Kreckel entering into the Employment Agreement.  The Committee believes that the Employment Agreement must be subjected to heightened scrutiny to ensure that there is

19

no disguised purchase consideration for the Debtor's business flowing directly to Ms. Kreckel rather than the estate.

54.    At first glance, the Employment Agreement seemingly entitles Ms. Kreckel to very generous employment terms and compensation, including a $300,000.00 annual salary plus discretionary bonus potential from the purchaser.  The Employment Agreement, which is terminable at-will, would also allow Ms. Kreckel to receive up to $100,000.00 if she leaves for "Good Reason" or is terminated "Without Cause."  The definition of "Good Reason" includes material changes in duties, reporting structure, or target bonuses—events that might naturally occur in a post-acquisition integration.  If Ms. Kreckel is terminated or departs shortly after closing, such actions would promptly trigger an additional payout directly to Ms. Kreckel.

55.    Even though the Employment Agreement is dated May 11, 2026, counsel for the Committee only received a copy of the Employment Agreement for the first time in the evening on Friday, May 22, 2026.  Given the holiday weekend, counsel and the members of the Committee have not had sufficient time to review and discuss whether the Employment Agreement should be regarded as post-Sale consideration that is being improperly diverted from the estate to an insider.

56.    Moreover, despite the Debtor's representation that it would disclose the existence of any agreement and its terms to the Court and all parties entitled to notice, upon information and belief, the Employment Agreement has not been filed with the Court nor circulated to the Debtor's creditors.  Furthermore, to the extent other potential purchasers are attempting to acquire the Debtor's assets, these parties must have access to the terms of Employment Agreement for purposes of determining what consideration is necessary to submit a competitive bid.

57.    At this time, neither the applicable parties-in interest nor the Court have had sufficient opportunity to properly evaluate whether the Purchase Price is fair or if part of the

20

consideration for the transaction is being delivered to Ms. Kreckel through post-closing compensation, equity, bonuses, deferred consideration, consulting payments, non-compete payments, indemnities, releases, severance payments, or other employment-related benefits. All interested parties should be provided with notice of, and sufficient time to review, the Employment Agreement before the Sale is approved.

## RESERVATION OF RIGHTS

58.     The Committee reserves all rights with respect to any proposed sale for the Debtor's assets and expressly reserves and preserves all rights to raise any additional objections to the relief requested by the Debtor before or at any final hearing.

## CONCLUSION

Based on the foregoing, the Committee respectfully requests that the Court (i) refrain from entering any Order that authorizes the Debtor to consummate a sale transaction that does not comply with the objections set forth herein, and (ii) grant such further relief as is just and proper.

Dated: May 27, 2026

FOX ROTHSCHILD LLP

*/s/ Jesse M. Harris*
Jesse M. Harris, Esq.
Matthew A. Skolnick, Esq.
Two Commerce Square
2001 Market Street, Suite 1700
Philadelphia, PA 19103
Telephone: (215) 299-2000
Facsimile: (215) 299-2150
Email: jesseharris@foxrothschild.com
Email: mskolnick@foxrothschild.com

*Counsel to the Official Committee*
*of Unsecured Creditors*